1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8
9
10   Connie B. Pappas,                    )
                                          )
11              Plaintiff,                )        No. CV-03-1449-PHX-PGR
                                          )
12        vs.                             )
                                          )        OPINION and ORDER
13   J.S.B. Holdings, Inc., d.b.a. R&D    )
     Speciality/Manco,                    )
14                                        )
                Defendant.                )
15   _____)

16        Pending before the Court is Defendant's Motion for Summary Judgment (doc

17   #40), which seeks the dismissal of the entirety of the First Amended Complaint ("FAC"),

18   Count One of which alleges a Title VII claim for sex discrimination based on hostile

19   environment sexual harassment, and Count Two of which alleges a Title VII claim for

20   retaliation.  Having considered the parties' memoranda in light of the evidence of

21   record[1], which the Court has examined in the light most favorable to plaintiff Connie

22   Pappas ("Pappas"), the Court finds that there are genuine issues of material fact that

23   preclude entry of summary judgment for defendant J.S.B. Holdings, Inc. ("JSB") on

24   either count.

25

26   _____

        [1]
27        The Court notes that it has considered the deposition extracts submitted by the
     parties, as well as the submitted unemployment compensation hearing transcript extract,
28   notwithstanding that neither side has made any effort to authenticate them as required by the
     Ninth Circuit, see Orr v. Bank of America, NT & SA, 285 F.3d 764, 774 and 776 (9th Cir. 2002),
     solely because neither side has objected to their use and both sides have relied on them.

1  Background

2      For purposes of the Court's resolution of the pending summary judgment motion,

3  the Court considers the relevant facts and background, viewed in Pappas' favor, to be

4  as follows.  Pappas first became employed by JSB, an aerospace machine shop, in

5  August 1998, and she was working as a Quality Assurance Manager ("QAM") at the

6  time she quit her employment with JSB on February 18, 2003; as QAM, she supervised

7  the department involved in the inspection of parts manufactured by JSB.  Pappas'

8  immediate supervisor as QAM was Kevin Beach, JSB's general manager; Beach's

9  supervisor was John Bloom, JSB's CEO.  During Pappas' tenure as QAM, Nick Anaya

10 ("Anaya"), John Gusel ("Gusel")[2], and Greg Beam ("Beam"), none of whom were

11 supervised by Pappas or supervised her, worked in JSB's engineering department.

12     Pappas generally alleges that Anaya, Gusel, and Beam, beginning after she was

13 promoted to the QAM position and continuing for the six months prior to her resignation,

14 engaged in a continuous pattern of harassment, rudeness, and offensive conduct

15 directed at her because they resented having to work with a female QAM and they

16 resented that she was paid a greater salary than they were, and that their harassment

17 led to her constructive discharge.

18     Pappas maintained a diary of their conduct towards her after their harassment

19 began.  The diary entries in evidence begin on August 22, 2002 and go through

20 February 11, 2003.  Pappas testified at her deposition that she did not document every

21 incident of harassment in her diary, such as the little, petty incidents, but that she did

22 include what she felt were the most important or significant events of harassment.  She

23 also testified that she did report almost every harassing incident, even if petty, to Kevin

24 Beach even though she did not note it in her diary.

25

26   [2]

27     Although the Court refers to him as "Gusel" in this opinion, the Court notes that it
   does not know the correct spelling of his name since he is also variously referred to as "Gussel",
28 "Goozel", and "Goozle" in different documents in the record.

1       According to Pappas, the specific instances of harassment directed at her, as

2  mentioned in her diary and elaborated upon in her testimony, consisted of the following:

3       (1) August 2002 - On August 22nd, Beam yelled at Pappas because it was taking

4  one of her inspectors too long to inspect the first example of an article being

5  manufactured.  Pappas informed John Bloom about the incident but she did not tell him

6  that Beam had used abusive language.

7       (2) September 2002 - When Pappas came back from vacation on September 9th,

8  neither Beam, Gusel, or Anaya would talk to her, and this absence of communication

9  lasted though mid-October and during that time any communication that needed to

10  occur between Pappas' department and the engineering department came through her

11  two subordinates.

12       During the weeks of September 9th through October 16th, Anaya would come into

13  Pappas' department and would stare at her, give her dirty looks, and would smirk at her.

14  Pappas overheard Anaya at some point twice telling her two subordinates that if Pappas

15  kept it up he would make sure that she would eventually quit.

16       (3) October 2002 - On October 3rd, Anaya, while walking by Pappas, ran into her

17  hitting her shoulder, and then smirked at her without saying anything, and Anaya

18  bumped into her again on October 7th and smirked at her. Pappas reported both

19  bumping incidents to Kevin Beach.

20       On October 7th, someone also tampered with Pappas' computer which she was

21  able to fix although the tampering affected her job performance because it took her

22  longer to figure out what was going on.  Pappas suspected that Anaya had done the

23  tampering because he had a way of getting around passwords, but he did not admit

24  doing so and no one Pappas asked would tell her that Anaya had done it.

25       On October 10th, someone stapled all of Pappas' business cards together, which

26  she reported to Beach, who, after talking to Anaya, told Pappas that Anaya denied

27  doing it.

28       On October 14th, someone used a marker to draw a mustache and devil horns

1    on the glass of a small picture of Pappas' grandson, and someone again "messed with"
2    Pappas' computer.  Pappas did not report what happened to Beach because she knew
3    that Anaya would deny having done it.
4        On October 16th, with things building up, such as the continuing lack of
5    communication from the engineering people, the incidents with her business cards and
6    her grandson's picture, and Anaya coming into Pappas' department many times in order
7    to stare and smirk at her, which he did again that day, Pappas got so upset that she
8    went home early and later that day told John Bloom that she could not take it anymore
9    and would come in the next day to get her stuff and quit without notice.  Bloom told her
10   he would hold a meeting the next day with everyone.
11       On October 17th, Bloom held a meeting with Kevin Beach, Pappas, Gusel, and
12   Anaya, during which Gusel, who was very pleasant during the meeting, stated that he
13   had not been talking to anyone because he was upset about not getting a raise, and
14   that he had a lot of issues with how Pappas was running her department, such as that
15   he did not like that the inspection department was behind on calibration, which Pappas
16   felt was constructive criticism; Gusel also stated at the meeting that he would help out
17   with issues in Pappas' department such as calibration. Anaya admitted at the meeting
18   that he had stapled Pappas' business cards together as a practical joke but denied that
19   he had defaced her grandson's picture.
20       The weeks of October 21st and 28th were "very good" for Pappas because no
21   harassing incidents happened, although Gusel, Anaya, and Beam were still not talking
22   to her.
23       (4) November 2002 - On November 5th, someone "messed with" Pappas'
24   computer again by moving files around, and someone also put shredded paper in
25   Pappas' desk drawer.  Pappas informed Kevin Beach about the paper incident but he
26   did not say anything.
27       On November 7th, Pappas discovered Anaya putting shredded paper in her desk,
28   to which he stated in a smirking manner that she had caught him. Pappas informed

1   Beach about the incident, who said he would talk to Anaya about it.  There was no

2   repetition thereafter of the shredded paper incidents or of the card stapling incident.

3         On November 11th, Anaya, who came into Pappas' office to use the copy

4   machine, rudely interrupted a conversation she was having with another employee.

5         On November 14th, a co-worker's computer was "messed with" and Anaya

6   laughingly said in Pappas' presence that he had done it as a practical joke on Kevin

7   Beach, who had been using the computer the previous day while the co-worker was

8   absent from work.  Anaya, who had been working in the area outside of Pappas' office

9   for the previous four days, thereafter loudly shut Pappas' door, rudely telling her that the

10   cigarette smoke coming from her office was bothering him.

11         (5) December 2002 - On December 2nd, Anaya answered an e-mail message

12   from Pappas with a sarcastic response.

13         (6) January 2003 - On January 7th, after Anaya had apparently been told that

14   Pappas was getting a new tamper-proof computer, Anaya barged into Kevin Beach's

15   office while he was having a meeting with Pappas and sarcastically stated that he

16   needed a new computer too because his had caught fire, to which Beach just laughed

17   which encouraged Anaya more.

18         On January 15th, Anaya, in a hateful and very sarcastic manner in a job-related

19   crticism, told Anaya that the next time she copied a spec for him to make sure she

20   copied all three pages, and falsely accused her of giving obsolete specs to a co-worker,

21   to which Pappas replied that there was no need for him to come into her office to start

22   shit.  At the time, both John Bloom and Kevin Beach were out of the state.

23         On January 24th, Pappas told John Bloom that she wanted to grow with the

24   company but that she could not work with Anaya and Gusel doing all of the things to

25   her.  On either that day or the next business day, she gave Bloom a copy of her diary

26   that went through the January 15th entry.

27         On January 27th, after a company meeting, Bloom informed Kevin Beach in

28   Pappas' presence about Pappas' diary and told him that it all had to stop and that if it

did not then Anaya and Gusel would have to go; Beach agreed.  Pappas informed
Bloom and Beach that her health was going bad because what was being done to her
and that every time Anaya or Gusel walked into her department she would start shaking
because she did not know what was going to come out of Gusel's mouth or what kind of
a plan Anaya had up his sleeve.  After January 27th the physical acts, whether practical
jokes or otherwise, ceased, although the staring and smirking from Anaya did not, nor
did Gusel's cursing.

(7) February 2003 - On February 6th, Anaya yelled at Pappas in a very sarcastic
manner that her department had made documentation mistakes in two folders
concerning MOTs and that it had to stop.  Anaya stood so close to Pappas during the
incident that his spit hit her face while he was yelling at her.  Pappas told him that she
would look in the MOTs, which were ones from before she became the department
manager.  Pappas left her office where she ran into John Bloom who saw her crying.
Pappas told Bloom what had happened, Bloom told Kevin Beach, and Beach talked to
Anaya about it.  Pappas then gave Beach her two weeks notice and Beach accepted it.
Anaya came into Pappas' office to make copies thirty minutes after Beach had talked to
him and started laughing at Pappas.

On February 7th, Anaya and Gusel came into Pappas' office laughing and
carrying on, and Anaya, who was using the copy machine, would turn around and laugh
at Pappas.  When Kevin Beach later came into her office, Pappas told him to tell Anaya
and Gusel to do their happy dance after she was gone, and Beach said he would talk to
them.

On February 10th, Pappas told Beach that she was the victim of workplace
bullying and harassment and gave him a copy of information on the subject that she had
found on the Internet.  She later that day gave the same information to John Bloom,
after he had asked her if she had changed her mind about quitting, and told him that the
bullying and harassment was why she could not stay on.  Beam, after asking about
Pappas leaving, stated that day in Pappas' presence that he was glad that the bitch was

1   leaving.   Gusel and Anaya kept coming into her office that day, and for the rest of the
2   week, staring at her.

3       Pappas filed a discrimination charge with the E.E.O.C. on February 19, 2003,
4   alleging claims for sex discrimination and retaliation.   Pappas' E.E.O.C. charge stated
5   in part that Gusel and Anaya verbally harassed her and subjected her to a hostile work
6   environment; a supplement to the charge stated that Gusel and Anaya would yell at her
7   using profanity.

8       Pappas subsequently filed for unemployment compensation benefits with the
9   Arizona Department of Economic Security ("ADES"), which JSB opposed.  An
10  evidentiary hearing on Pappas' unemployment compensation claim was held on April
11  14, 2003 before an ADES hearing officer.  Pappas testified at the ADES hearing that the
12  charges she made to the E.E.O.C. were not any different than what she told the hearing
13  officer about.  She also testified that Gusel would always use profanity, that she did not
14  recall the particular words that he used other than the "f-word", which he used a lot as it
15  was part of his nature, and that Anaya also used profanity at her.   She also testified at
16  the ADES hearing that Anaya's sarcasm directed at her was work-related, and that
17  when co-workers yelled at her they were talking about business-related issues.  She
18  further testified that she quit because her nerves were completely shot and she could
19  not take it anymore, and because Anaya and Gusel had been talked to numerous times
20  with no disciplinary action being taken.

21      Pappas' original verified complaint, filed in state court on June 27, 2003, alleged
22  in part that Anaya and Gusel's verbal assaults and hostile treatment of her included
23  cursing and scatological language made either to her or in her presence.  The complaint
24  did not specifically allege any gender-related comments, nor did it specifically allege that
25  Anaya and Gusel's treatment of Pappas was based on their resentment of her as a
26  woman supervisor.

27      Pappas' verified FAC, filed on March 31, 2004, which the Court treats as an
28  affidavit, <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 (9th Cir. 1995) ("A verified complaint

- 7 -

1  may be used as an opposing affidavit under Rule 56 ... if it is based on personal

2  knowledge and set[s] forth specific facts admissible in evidence"), alleges in paragraph

3  nine that Anaya, Gusel, and Beam were angry and hostile towards Pappas because

4  they believed her QAM position should have been given to a man, they resented having

5  to work with a female QAM, and they resented the fact that a woman was earning a

6  greater salary as QAM than they were for their jobs.  It also alleges in paragraph ten

7  that their harassing and offensive conduct towards Pappas including calling her a "cunt"

8  and a "bitch", telling her that she should instead be working in a "woman's position",

9  calling her obscene names, and telling her she must be suffering from "P.M.S.".  It

10  further  alleges in paragraph eleven that Pappas told Beach and Bloom that Anaya,

11  Gusel and Beam had mistreated and disrespected her because she was a female

12  supervisor.

13       Pappas testified at her deposition, held on March 2, 2004, that she left out of her

14  diary all of the cussing that Gusel did, although she could have filled up the whole diary

15  with his cussing, that Gusel did 99.9% of the cussing, that the "f-word" was part of every

16  sentence of Gusel's, that it upset her that Gusel would cuss every time he opened his

17  mouth, that Gusel would not just curse around her and that she had heard Gusel call

18  Kevin Beach names, but she had not heard Gusel call anyone names except her and

19  Beach.  Pappas further testified that she had heard Gusel call her "a cunt" and "a bitch";

20  she also testified that it was true statement that she had not written in her diary that

21  Gusel or anyone else had referred to her as a cunt or a bitch.  She further testified that

22  while it was true she had not testified during the ADES hearing that Gusel had

23  specifically referred to her as a cunt or bitch, she had testified that Gusel had cussed at

24  her and although she did not testify as to what names he used during his cussing, to her

25  that was cussing because "[w]hen you're being called names, you're being cussed at."

26  Pappas testified that she complained to her physician, Dr. Parker, on October 16, 2002

27  about her job-related tension and anxiety.

28       Dr. Parker testified at his deposition, held on March 8, 2004, that, based on his

1   medical records, Pappas first complained to him about job-related stress on October 16,

2   2002, that she told him how upset she was about the harassment and that she was

3   planning on quitting that day, and that he probably advised her that if she had a problem

4   on her job to do something to take care it.  He also testified that Pappas told him on

5   January 24, 2003 that her nerves were completely shot because she was under terrible

6   stress at work, although he could not remember whether she told him that the stress

7   was the result of harassment or whether he just felt that she was being harassed. He

8   further testified that from January until February 3, 2003, Pappas had been on Atvian for

9   stress and anxiety, and that on February 3rd he prescribed Librium for her, which was a

10  stronger medication for stress and anxiety.

11          In a declaration dated November 16, 2004, Pappas essentially repeated verbatim

12  paragraphs nine and ten of her FAC.  She also stated that Anaya constantly shouted

13  profanity at her, that Gusel frequently called her a "cunt", a "bitch", and used the word

14  "fuck" towards her in a hostile manner.  She further stated that Beam told Beach in her

15  presence on February 10, 2003, after being informed that Pappas had quit because of

16  bullying, that he was glad that the bitch was leaving.

17          In a declaration dated November 14, 2004, Janice Wilt, a JSB co-worker who

18  was fired on February 7, 2003, stated that she knew both Pappas and Gusel during her

19  employment at JSB, that she recalled an incident on some unspecified date where

20  Gusel, after accessing JSB's computerized payroll records and learning that Pappas

21  was paid more than he was, angrily stated in Wilt's presence that he was really pissed

22  off that the "fucking bitch" made more money than he did, and that on another

23  unspecified date while Pappas was on vacation, Wilt heard Gusel refer to Pappas as a

24  "dumb bitch", that on another unspecified occasion Gusel stated that all women should

25  stay home with their children rather than work.  Wilt also stated that shortly before

26  Pappas resigned, Wilt told Kevin Beach that Pappas might quit if something was not

27  done to stop Anaya and Gusel's actions but Beach did not take her seriously, stating

28  that Pappas just blew things out of proportion, and that a few minutes thereafter Wilt

1  told Anaya that he had to stop screwing around with Pappas, and Anaya, looking happy

2  and smirking, said "good" when Wilt told him that his actions bothered Pappas.  Wilt

3  further stated that she suffered some unspecified "incident of offensive sexual

4  harassment" on February 5, 2003 by a co-worker, one not mentioned by Pappas as

5  being involved in her harassment, and that she reported the incident to John Bloom who

6  did not say what he would do about it.

7  Discussion

8  Count One

9      Count One of the FAC raises a sex discrimination in employment claim based on

10  the existence of a sexually hostile working environment.   In order to survive summary

11  judgment on her hostile work environment claim, Pappas must submit significant

12  probative evidence as to each of the three elements of such a claim: (1) that she was

13  subjected to verbal or physical conduct of a sexual nature, (2) that this conduct was

14  unwelcome, and (3) that this conduct was sufficiently severe or pervasive to alter the

15  conditions of her employment and create an abusive working environment.  Little v.

16  Windermere Relocation, Inc., 301 F.3d 958, 966 (9th Cir. 2002).  For purposes of

17  resolving the summary judgment motion, the Court considers the first and third

18  elements to be in dispute.

19       As to the first element, Pappas must demonstrate that she was in some manner

20  targeted for harassment because of her gender and not merely that she was subjected

21  to nonactionable offensive behavior by co-workers.  Dominguez-Curry v. Nevada

22  Transportation Dep't, __ F.3d __, 2005 WL 2218908, at *4 (9th Cir. 2005) ("The plaintiff

23  [alleging a hostile work environment sexual harassment claim] also must prove that any

24  harassment took place because of sex.") (Internal quotation marks omitted.)  This

25  distinction between mere harassment and discriminatory harassment exists because

26  Title VII is not a general civility code for the workplace and does not prohibit all

27  employment-related verbal or physical harassment.  Oncale v. Sundowner Offshore

28  Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (1998); see also, Brooks v. City of

1  San Mateo, 229 F.3d 917, 927 (9th Cir. 2000) ("[N]ot all workplace conduct that may be

2  described as harassment affects a term, condition, or privilege of employment within the

3  meaning of Title VII.")   JSB argues in part that it is entitled to summary judgment as a

4  matter of law on Count One because Pappas has failed to submit sufficient evidence

5  establishing that her alleged harassment was sex-based.

6         There is no doubt that a sufficiently pervasive stream of vulgar gender-based

7  epithets by co-workers can support a hostile environment claim.  *See e.g.*, Steiner v.

8  Showboat Operating Co., 25 F.3d 1459 (9th Cir. 1994), *cert. denied*, 513 U.S. 1082

9  (1995).  The very significant problem here is that almost all of the individual, specific

10  instances of aggravating and antagonistic conduct directed at Pappas by Anaya and

11  Gusel, and to a much lesser extent, Beam, as memorialized in her diary and testified to

12  at the ADES hearing and at her deposition, are on their surface neither sexual in nature

13  nor gender-directed.   Non-sexual harassing conduct directed at a woman can, in

14  appropriate circumstances, be considered in determining whether a sex-based hostile

15  work environment exists since "there is no legal requirement that hostile acts be overtly

16  sex or gender-specific in content" in order to be actionable sex discrimination under Title

17  VII.  E.E.O.C. v. National Education Ass'n, 2005 WL 2106164, at *3 (9th Cir. 2005).  In

18  this case, given Pappas' underlying theory that she was harassed because she was a

19  female supervisor, there must be evidence linking the facially non-sex-specific

20  harassment to Pappas's gender for that evidence to be probative of Title VII

21  discrimination.  *See* Oncale, 523 U.S. at 80, 118 S.Ct. at 1002; *see also*, Bowman v.

22  Shawnee State University, 220 F.3d 456, 463 (6th Cir. 2000) ("Non-sexual conduct may

23  be illegally sex-based and properly considered in a hostile environment analysis where

24  it can be shown that but for the employee's sex, [she] would not have been the subject

25  of harassment.")

26         JSB initially argues that the pejorative factual allegations of an anti-female bias

27  relied on by Pappas should be totally disregarded by the Court on the ground that they

28  are a belated and disingenuous effort to create a sham issue of fact to stave off

1   summary judgment.  JSB asserts that the only patently gender-related harassing

2   comments Pappas alleges were directed at her, *e.g.*, the "cunt", "bitch", "women's

3   position", and "P.M.S." comments set forth in paragraph 10 of the FAC and the

4   allegations that the harassment was based on the plaintiff's gender set forth in

5   paragraphs 9 and 11 of the FAC, were specifically raised for the first time in the FAC.

6   Comparing the FAC to a contradictory affidavit submitted to improperly create an issue

7   of fact, JSB argues that the Court should invoke the "sham affidavit" rule to disregard

8   these FAC allegations on the ground that they contradict earlier statements in Pappas'

9   diary, in her testimony at her unemployment compensation hearing, in her E.E.O.C.

10  charge, and in her original complaint.  While there is clearly a credibility issue arising

11  from Pappas' failure to raise her gender-specific evidence prior to the filing of the FAC,

12  the Court cannot agree that such evidence cannot be considered by the Court in

13  resolving the summary judgment motion.

14          The Court need not determine whether the "sham affidavit" rule applies in this

15  type of situation because the Court concludes that the FAC allegations at issue are not

16  in any case sufficiently inconsistent with Pappas' earlier allegations, charges, or

17  testimony.  The purpose of the sham affidavit rule is to forbid testimony that "flatly

18  contradicts" earlier testimony in an attempt to avoid summary judgment by

19  manufacturing an issue of fact.  Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 267

20  (9th Cir. 1991).   While Pappas in fact did not specifically refer to gender-based

21  scatological comments prior to filing her FAC, with the exception of one "bitch" comment

22  noted in her diary allegedly made by Beam after he found out that she was quitting, the

23  Court cannot conclude that her FAC allegations flatly contradict her earlier allegations

24  and testimony since she consistently referred to co-workers' use of profanity, and she

25  never previously specifically denied that any of that profanity consisted of the gender-

26  directed comments on which she is now relying. The Court considers the FAC

27  allegations to be in effect an elaboration on Pappas' earlier allegations and testimony.

28  *See* Messick v. Horizon Industries, Inc., 62 F.3d 1227, 1231 (9th Cir. 1995) (Court noted

1     that under the "sham affidavit" rule, the non-moving party is not precluded from

2     "elaborating upon, explaining or clarifying prior testimony.")

3         That the evidence of record can support a finding that Pappas was repeatedly

4     subjected to discourteous, boorish, mean-spirited treatment by certain of her co-workers

5     that resulted in an acrimonious and frustrating work situation for her cannot be

6     reasonably disputed.  The issue is, however, whether the totality of the evidence is

7     sufficient to create a triable issue as to whether Pappas was in some manner subjected

8     to discrimination based on sex.  JSB contends that Pappas' gender-related evidence is

9     insufficient to defeat summary judgment because it is almost entirely based on her own

10     self-serving, often conclusory, and in some cases, speculative, statements, as set forth

11     in the FAC, in her declaration, and in her deposition testimony.  While that contention is

12     certainly not without a factual basis, it is not a sufficient basis on which to grant

13     summary judgment because the Court is not permitted to weigh Pappas' credibility at

14     the summary judgment stage.  <u>Dominguez-Curry v. Nevada Transportation Dep't</u>, 2005

15     WL 2218908, at *5-6 ("The district court also inappropriately weighed Dominguez's

16     credibility in dismissing her allegations as 'vague and conclusory,' 'unsupported,' and

17     'self-serving.' ... The district court also improperly dismissed Dominguez's allegations as

18     consisting of nothing more than 'self-serving statements in her own deposition and

19     affidavit.'  Such observations go to whether Dominguez is credible, a determination that

20     is exclusively within the province of the factfinder at trial, not the district court on

21     summary judgment.")

22         Being very mindful of its obligation to assess the record in the light most

23     favorable to Pappas, which means that the Court must believe Pappas' evidence and

24     must draw all justifiable inferences in her favor, <u>Anderson v. Liberty Lobby</u>, 477 U.S.

25     242, 255, 106 S.Ct. 2505, 2513 (1986), the Court concludes that there is sufficient

26     evidence in the record, albeit perhaps minimally so, from which a reasonable juror might

27     conclude that the harassment of Pappas was at least prompted in part by her gender.

28     This evidence, for example, not only consists of Pappas' testimony that Gusel

repeatedly called her, in her presence, such misogynistic terms such as "cunt" and "a bitch", but co-worker Janice Wilt's testimony that she heard Gusel refer to Pappas as a "fucking bitch" and a "dumb bitch", and that Gusel stated to her that women should stay home with their children rather than work.  Because Pappas has submitted some evidence of sexual epithets and hostility towards women in the workplace that, viewed in her favor, can be considered more than merely colorable, the other evidence of her tormentors' hostility towards her, such as the pranks and the ostracism, must be viewed for purposes of the summary judgment motion in the context of their being part of the totality of circumstances surrounding Pappas' sex-based hostile work environment and having contributed to that environment. *See* Williams v. General Motors Corp., 187 F.3d 553, 563-64 (6th Cir. 1999).

As to the third element of a hostile work environment claim, Pappas must establish that the sexually harassing conduct, viewed both subjectively and objectively, was severe or pervasive enough as to alter the conditions of her employment.[3]  Little v. Windermere Relocation, Inc., 301 F.3d at 966.  In determining whether Pappas has shown the objective hostility of her work environment sufficiently to withstand summary judgment, the Court must consider the totality of the circumstances, including such factors as the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with the employee's work performance.  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 2283 (1998).  The Court must assess whether the workplace was objectively hostile from the perspective of a

---

[3]     The Court does not believe that there is any real dispute as to whether Pappas subjectively viewed her work environment to be hostile. *See* McGinest v. GTE Service Corp., 360 F.3d 1103, 1113 (9th Cir. 2004) ("Subjective hostility is clearly established ... through [plaintiff's] complaints to supervisors and to the EEOC.")  To the extent that JSB argues that there may be an issue as to whether Pappas believed her harassment to be based on her sex given her failure to include the alleged sexually derogatory comments in her diary, that is an issue for the jury given Pappas' testimony that she did not include everything that happened to her in her diary.

1   reasonable woman.  Dominguez-Curry v. Nevada Transportation Dep't, 2005 WL
2   2218908, at *4.
3           JSB argues in part that it is entitled to summary judgment on Count One, even if
4   the alleged harassment was sex-based, because Pappas' allegations do not meet the
5   required threshold for pervasiveness or severity inasmuch as the incidents she
6   describes are too few, too separate in time, and too mild to create an abusive working
7   environment.  While the Court agrees with JSB that none of the incidents underlying the
8   alleged harassment were particularly severe, they do not need to be to defeat summary
9   judgment because the Court concludes that a reasonable juror, viewing the evidence in
10  Pappas' favor, could credit Pappas' general allegation that she received fairly constant
11  abuse for a period of six months and find that the incidents and derogatory comments,
12  viewed in their totality, were sufficiently pervasive and that they unreasonably interfered
13  with Pappas' ability to do her job.[4]  See McGinest v. GTE Service Corp., 360 F.3d
14  1103, 1113 (9th Cir. 2004) ("The required level of severity or seriousness varies
15  inversely with the pervasiveness or frequency of the conduct.")
16          Since the Court has concluded, for purposes of summary judgment, that
17  sufficient evidence exists to support Pappas' claim that she suffered a hostile work
18  environment, the Court must determine whether sufficient evidence exists such that a
19  reasonable juror could conclude that JPS is liable for the harassment.  An employer is
20  liable under Title VII for co-worker sexual harassment if the employer knew, through its
21  management-level employees, about the harassment, or in the exercise of reasonable
22  care should have known about it, and failed to take prompt corrective action reasonably
23

24          [4]     While Pappas' evidence concerning the derogatory sexual comments directed at her
25  lack specificity as to their frequency, being replete with less than specific statements such as
    "frequently", "constantly", and "many", the Court cannot disregard them at the summary
26  judgment stage for that reason.  See Dominguez-Curry v. Nevada Transportation Dep't, 2005
    WL 2218908, at *5; see also, Torres v. Pisano, 116 F.3d 625, 631 (2nd Cir. 1997) (Court noted
27  that a jury could reasonably find pervasive sexual harassment based on the plaintiff's testimony
    that she was constantly harassed notwithstanding that the plaintiff could recall the specifics of
28  only a few incidents of harassment.)

1   calculated to end the harassment.  *Id.* at 1119-20.  *Accord*, Swenson v. Potter, 271 F.3d

2   1184, 1191-92 (9th Cir. 2001) (Employer is liable for co-worker sexual harassment if the

3   employer fails to take corrective action after learning of the harassment or takes

4   inadequate corrective action that emboldens the harasser to continue his misconduct.)

5          JSB argues that it cannot be held liable as a matter of law for any sexual

6   harassment that Pappas suffered because she did not report any sex-based

7   harassment to either Kevin Beach or John Bloom and, as to the harassing incidents that

8   she did report, it took steps to address her concerns and remedy the situation.   The

9   Court disagrees.  First, a reasonable juror could conclude that JSB knew about the

10  sexual harassment in that there is some marginally sufficient evidence in the record that

11  Pappas complained to Beach and/or Bloom that she was being harassed because of

12  her gender.  Second, a reasonable juror could conclude that JSB took inadequate

13  action to end the harassment because there is significant probative evidence in the

14  record that the harassment continued for months after Pappas first started reporting it,

15  including evidence that some of the harassment, such as Anaya's staring and smirking

16  and Gusel's cursing, continued with Beach's knowledge even after Bloom informed

17  Beach on January 27, 2002 that all of the harassment had to stop.  Third, a reasonable

18  juror could conclude from the evidence that neither Anaya or Gusel received any

19  discipline as a result of their harassment of Pappas, thus embolding them to continue

20  their harassment.

21  Count Two

22         Count Two of the FAC raises a Title VII retaliation claim.  In order to defeat

23  summary judgment as to this claim, Pappas must submit significant probative evidence

24  showing the existence of each element of such a claim: that she had engaged in activity

25  protected by Title VII, that an adverse employment action was thereafter taken against

26  her, and that a causal link exists between the protected activity and the adverse

27  employment action. Kortan v. California Youth Authority, 217 F.3d 1104, 1112 (9th Cir.

28  2000).  JSB argues that it is entitled to summary judgment as to this claim as a matter of

1   law because Pappas has not established that she was subjected to an adverse

2   employment action.  The Court cannot agree.

3           While it is not clear from the FAC exactly what Pappas is alleging in terms of her

4   retaliation claim, the Court concludes from Pappas' response to the summary judgment

5   motion that she is alleging that her constructive discharge was the adverse employment

6   action supporting her retaliation claim.[5]  Constructive discharge can be an adverse

7   employment action for purposes of establishing a Title VII retaliation claim. *See*

8   Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 2351 (2004).

9   ("Under the constructive discharge doctrine, an employee's reasonable decision to

10  resign because of unendurable working conditions is assimilated to a formal discharge

11  for remedial purposes."); *see also*, Jordan v. Clark, 847 F.2d 1368, 1377 n.10 (9th Cir.

12  1988), *cert. denied*, 488 U.S. 1006 (1989) ("If shown, constructive discharge is an

13  adverse employment action.")

14          The Court concludes that the evidence of record, viewed in Pappas' favor, is

15  sufficient to create a triable issue of fact as to whether a reasonable person in Pappas'

16  position would have felt compelled to quit because of intolerable working conditions.

17  Suders, 124 S.Ct. at 2354; Steiner v. Showboat Operating Co., 25 F.3d at 1465.  This

18  evidence includes, for example, that the harassment was frequent, that as a result of

19  the harassment Pappas would begin to shake every time Anaya or Gusel came into her

20  office, that the sexually harassing conduct was still continuing as of the date of her

21  resignation notwithstanding that Kevin Beach had on several occasions talked to Anaya

22  and Gusel about their conduct, that Pappas began to complain to her physician about

23  job-related stress in mid-October 2002 and complained to him in late January 2003 that

24  she was under terrible stress at work, that her physician prescribed Ativan for her stress

25  and anxiety in January 2003, and that her physician placed her on Librium, a stronger

26

27          [5]

28          The Court notes that it does not construe the FAC as stating a separate claim for
    constructive discharge.

1  medication, for her stress and anxiety in early February 2003.  Because there is a

2  genuine issue of fact as to whether Pappas was constructively discharged, summary

3  judgment is not appropriate on the retaliation claim.

4         Therefore,

5         IT IS ORDERED that Defendant's Motion for Summary Judgment (doc. #40) is

6  denied.

7         IT IS FURTHER ORDERED that the parties shall submit their Joint Pretrial

8  Statement, their joint settlement letter, and any motions in limine no later than

9  **November 18, 2005**.[6]

10         IT IS FURTHER ORDERED that the Pretrial Conference shall be held on

11  **Monday, December 12, 2005 at 1:30 p.m.** in Courtroom 601.[7]

12         DATED this 28th day of September, 2005.

13

14  _____

      Paul G. Rosenblatt
15        United States District Judge

16

17

18

19

20

21

22

23

24  _____

25  [6]  The parties shall review paragraphs 5-7 of the Scheduling Order (doc. #14), entered

26  on October 23, 2003.

[7]  The parties shall review paragraph 8 of the Scheduling Order, in particular that
27  portion requiring the presence at the Pretrial Conference of a party or representative with full
28  settlement authority.